(No. 35715.—

*In re* GEORGE W. HANSEN, Attorney, Respondent.

*Opinion filed January 20, 1961.—Rehearing denied March 27, 1961.*

B**RISTOW** and K**LINGBIEL**, JJ., dissenting.

J. R. C**HRISTIANSON**, of Chicago, *amicus curiae*.

C**HARLES** J. O'L**AUGHLIN**, of Chicago, (A**LBERT** E. J**ENNER**, J**R**., and S**HELDON** K**ARON**, both of Chicago, of Chicago, of counsel,) for respondent.

Mr. J**USTICE** H**OUSE** delivered the opinion of the court:

The Committee on Grievances of the Chicago Bar Association, acting as commissioners pursuant to Rule 59, has filed a report finding respondent guilty of unprofessional conduct and recommending that he be suspended from the practice of law for a period of three years. This review is on respondent's exceptions to the findings and recommendations.

Respondent is 59 years old and was admitted to the Illinois bar in 1925. He has been engaged in the practice of law

and real-estate financing in south Chicago since 1929. His wife, Leith, also a member of the bar, has been associated with him since 1949. A substantial part of his real-estate business was the financing of properties for Negroes, including their church properties.

The transaction complained of arose out of a proposed loan to Estella M. Starks, a Negro housewife, 69 years of age with a fourth-grade education. She had eight children, including a daughter Hazel Bryant. The latter needed funds to defend against a charge of possession of narcotics, and her mother undertook to raise money for that purpose. Mrs. Starks and another daughter, Victoria Wright, went to respondent's office the night of June 12, 1954, and requested a loan of $500. When security was requested she offered three lots and was told to bring in her evidence of title. An evening or two thereafter the two women returned with an unrecorded deed bearing date the previous year and a contract showing that she had paid $1095 for the property. Mrs. Starks told respondent that she needed the loan to pay expenses of defending the criminal action against Hazel. He prepared a quitclaim deed and it was executed and delivered to respondent during the first week of July. Both deeds were filed for record July 13, 1954.

The evidence is conflicting as to the conversations relative to the loan. Respondent testified that he would make the loan provided the title company's report showed clear title, subject only to unpaid taxes and assessments and on condition that they be subsequently cleared through a tax foreclosure proceeding. Mrs. Starks testified that nothing was said about a title report or tax foreclosure and that she expected the loan would be consummated after delivery of the deed.

The title report was received by respondent about July 27, 1954, and he advanced $114.50 for it and the recording fees. The report was immediately delivered to another attorney with instructions to institute a tax foreclosure. The

loan was never made and subsequently Mrs. Starks demanded that title be returned to her. In April, 1955, she complained to the State's Attorney and the following month made complaint to the Committee on Inquiry of the Chicago Bar Association.

The property was ultimately bid in by an outside party for substantially more than the guaranteed bid and, with the approval of Mrs. Starks's counsel, respondent advanced $1692.17 to redeem the property. On final settlement respondent was out of pocket $299.95 and Mrs. Starks $122.96, plus attorneys fees incurred by her.

At the outset, *amicus curiae* agrees with respondent that taking of an absolute conveyance rather than a mortgage or trust deed is a security device widely used in the area and is unobjectionable, and states that the recommendations were not primarily predicated on the form of security used.

The complaint does not charge respondent with fraud but alleges that his conduct tends to bring the legal profession into disrepute. The report of the commissioners likewise does not make a finding of actual fraud but states that his conduct is tainted with moral turpitude. Finally, the recommendation of suspension is based upon conduct asserted to be unprofessional, unethical, dishonorable, denoting a lack of good character and tending to bring the profession of law and the courts of justice into disrepute and contempt.

We have held over the years that to warrant disbarment or suspension, the record must be free from doubt not only as to the act charged but also as to the motive with which it is done. The rule has been applied where legal fees were charged to be excessive, (*People* v. *Lotterman,* 353 Ill. 399,) and where advances or collections have been held and not paid over (*People* v. *Hammond,* 356 Ill. 581; *In re Lasecki,* 358 Ill. 69; *In re Brumond,* 381 Ill. 139). In each of the foregoing cases the rule was discharged because of lack of proof of fraud.

*Amicus curiae* does not point out what motivated respondent to take and hold this title. He frankly admits that possible motives advanced by him are in the realm of conjecture, and states that it is for this court to make a determination of respondent's motives. There is no positive proof of an intent on the part of respondent to defraud Mrs. Starks of her property, nor does the record establish that he expected to gain through commissions. We cannot disbar or suspend him on speculation as to his motives.

This is not to say that we condone respondent's actions. He was an experienced man both in the field of law and as a money lender. He was dealing with an elderly, uneducated, inexperienced woman who was living on old age pension. He was aware of her urgent, desperate, and immediate need for funds to help a distressed member of her family. That Mrs. Starks placed trust and confidence in respondent is evidenced by her willingness to deliver title to respondent without a contract, receipt or assurance other than his word.

While she did not approach him in his capacity as a lawyer, she knew he was a member of the legal profession, and could expect fair, forthright and straightforward treatment. In her ignorance she could not be expected to understand when he doffed the robe of his profession and donned the cloak of his vocation, nor was she required to do so. See: *In re Serritella,* 5 Ill.2d 392.

Undoubtedly this woman was led to believe that the loan would be made without undue delay. Because of the urgency of her need, it is inconceivable that she would have parted with title had she known the proceeds of the loan would be held up pending a tax foreclosure. According to respondent's own statement he agreed to make the loan when the deed was recorded and a title report received showing the property clear except for unpaid taxes, and that the report would be available in a week or less. The title objections appear to have been minor. One could have been met by an affidavit of identity while the exact nature of the other was

not disclosed. Nevertheless, the property was later sold and the record shows no title problems. These objections do not furnish a valid excuse for failure to disburse the loan. Furthermore, respondent gives no satisfactory reason for immediately directing tax foreclosure proceedings, thereby creating additional expenses, without first paying the net proceeds of the loan to Mrs. Starks.

Respondent asserts that he was denied the right to properly defend himself because continuances were not granted. The requests for continuances were based on ill health. He had two coronary occlusions after the institution of these proceedings. Several continuances were granted and the hearings commenced on July 11, 1958, seven months after the original setting. They were concluded on December 3, 1958. The commissioners permitted respondent to testify as to his version of the transaction by affidavit, and he was not subjected to cross-examination. Apparently this procedure was agreeable to the parties since the affidavit was admitted by stipulations, and we find no denial of due process.

We are of the opinion that respondent deserves to be censured. In so holding we point out specifically that which we are condemning, since we have heretofore indicated a lack of proof of deliberate fraud. We conceive it to have been respondent's duty, in dealing with a borrower with such a background, to make absolutely clear just what the transaction entailed in time and expense and once having committed himself to make the loan, a further duty devolved upon him to close it with dispatch. In this he failed, and in so doing his actions tended to bring the legal profession into disrepute.

*Respondent censured.*

BRISTOW and KLINGBIEL, JJ. dissenting.