(No. 49243.—)

*In re* BURTON SHERRE, Attorney, Respondent.

*Opinion filed October 5, 1977.*

Mary M. Conrad, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Cornelius Pitt, of Chicago, for respondent.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

On May 26, 1976, this court, acting under Rule 761 (58 Ill. 2d R. 761), suspended respondent, Burton Sherre, from practicing law until further order. The ensuing disciplinary proceedings now come before us on his exceptions to the report of the Review Board of the Attorney Registration and Disciplinary Commission, which affirmed a recommendation by the hearing panel that respondent be disbarred.

Respondent was found guilty, following a jury trial in the United States District Court for the Northern District of Illinois, Eastern Division, on nine counts of mail fraud, five of which were reversed in post-trial proceedings and appeal. The convictions on counts 9, 10, 11 and 15 of the indictment were affirmed in *United States v. Joyce* (7th Cir. 1974), 499 F.2d 9. Respondent was given a six-month suspended sentence, fined $1,000 (which has been paid), and placed on three years' probation.

The affirmed counts alleged that respondent, Thomas E. Joyce, Harry Wallace and Robert L. Ostrander (defendants), as part of a fraudulent scheme, organized an insurance company, Global Surplus and Excess Limited (Global), under the laws of the Bahama Islands and thereafter entered into a trust agreement with the Cosmopolitan National Bank of Chicago (Cosmopolitan), known as trust No. 15385, which was represented to have been established for the protection and benefit of United States and Canadian policyholders of Global; that respondent was designated as attorney in fact for the trust and given power of direction over the trust on behalf of the policyholders, and that certain real estate was conveyed into the trust. An Illinois corporation, Global Surplus and Excess Limited of Illinois, was organized and represented to be a holding company for the trust real estate and a wholly owned

subsidiary of Global. The substance of other allegations was that as part of the scheme defendants had prepared or secured appraisal letters falsely stating the value of the trust real estate to be greater than its actual worth, and had prepared false balance sheets and financial statements misrepresenting the true financial condition of Global and its wholly owned subsidiary; that omitted from these documents was the fact that the trust real estate was heavily mortgaged; and that defendants, through Cosmopolitan or otherwise, circulated these materials, including copies of the trust agreement, to various State departments of insurance and insurance agents and brokers in order to induce the departments to approve, and agents and brokers to place, insurance business with Global. It was also alleged that defendants had converted to their own use funds on deposit in various banks and represented to be for the benefit of Global's policyholders.

Respondent testified before the panel hearing the disciplinary complaint. That body found that "[r]espondent was not candid, forthright nor remorseful in his testimony before the Hearing Board." His version of the chain of events was that Global had been organized by Joyce, Wallace and Ostrander, who each held a one-third interest, that those individuals had secured the inflated appraisals and prepared the false financial statements and balance sheets; that respondent had simply done the legal work and knew nothing of the misrepresentations; that respondent was neither an officer nor stockholder in Global or its subsidiary, and stood to gain nothing from the scheme except his fees as an attorney amounting to some $16,000. He reiterated his belief that "I acted as no more than any responsible attorney would do," and had not been guilty of any criminal conduct.

Respondent's position is, of course, in fundamental conflict with the fact of his conviction on the Federal charges. In discussing the evidence in that case as it related

to respondent, the court of appeals made the following observations:

"Sherre attempts to void his conviction by claiming a lack of knowledge during his association with Global. The evidence refutes this claim. Sherre was centrally involved in the scheme, since he handled most of the correspondence from Global's Chicago office. It would be extraordinary if he never learned what was going on. This does not mean he can be convicted by association, but it does increase the significance of any evidence tending to show his actual knowledge of the scheme's nature.

According to the credited testimony, Sherre was first involved in this scheme in May 1965. On May 26, he was at a meeting with Joyce, Ostrander and Wallace and a Mrs. Chambers. Joyce told the others that he would place certain property, which he described to the group as worth more than $750,000, into the trust fund at Cosmopolitan. In Sherre's presence, he then dictated a letter describing the trust property as worth $1,180,000. In the presence of Sherre and the others, Mrs. Chambers typed the letter and signed the name Raymond Kusniar to it.

A Mrs. Lewis testified that in November 1965, she met with Sherre, Joyce and Ostrander. She warned all three that they were under government scrutiny and that there was particular concern about the land trust. She also complained about not being paid, and in Sherre's presence, Joyce told her that Global was insolvent. She responded that there had been 'several occasions' when it had enough money to pay her.

Sherre had the power of direction over the trust at Cosmopolitan. As an attorney, he must

have known that Cosmopolitan, as trustee of an Illinois land trust, was completely subject to his directions on behalf of Global, and had no independent power to protect the policyholders. Sherre wrote the count 15 letter, urging brokers not to correspond directly with Cosmopolitan, which indicates he was aware that Cosmopolitan would not support Global's representations.

The evidence concerning Sherre's involvement justified the jury's conclusion that he participated in the common plan to defraud with the requisite criminal intent." 499 F.2d 9, 21-22.

We would add that among other letters admitted into evidence in the disciplinary hearing is one written by respondent in response to a broker's inquiry regarding the trust, in which respondent confirms the existence of the trust and the fact that its corpus was valued in excess of $500,000. Additionally, it is apparent from respondent's testimony that he had known Joyce, who had been convicted in 1963 or 1964 of an offense involving the misapplication of Federal bank funds, for many years, officed in a Chicago "store front" building in the vicinity of Harlem and Higgins leased by Joyce and did a substantial amount of legal work for Joyce and various companies owned by him in addition to those involved here. Among those was Wor-Wid Construction Company. Respondent testified he "probably formed the corporation and handled all the contracts and all the closings," and that Wor-Wid was dissolved by the Secretary of State in "I think 1966. Maybe 1965," but that the mailed notices regarding dissolution had gone to Joyce and respondent had no knowledge of the dissolution. The June 1966 statements of Global's financial condition, which respondent admitted he read and which were distributed by him and other defendants, listed as an asset 1,000 shares of Wor-Wid valued at $200,000.

This court has repeatedly held a criminal conviction conclusive on the question of a respondent's guilt (*In re Hutul* (1973), 54 Ill. 2d 209, 214; *In re Steinbrecher* (1973), 53 Ill. 2d 413, 420; *In re Fumo* (1972), 52 Ill. 2d 307, 309), and that conviction of an offense involving fraud constitutes moral turpitude and warrants disciplinary action (*Fumo; In re Gartland* (1970), 47 Ill. 2d 177, 183). The issue before us is the nature and extent of that discipline.

Respondent urges that the recommended disbarment, concurred in by all participating members of the hearing panel and Review Board, is unjustifiably severe. He stresses that there have been no other complaints regarding his professional conduct since his admission to the Illinois bar in 1934, and calls our attention to his four years' service with the armed forces and the fact that he "presently holds the rank of Major, U. S. Army, Reserve Retired." He emphasizes that no agent, broker or policyholder suffered any loss from the fraudulent operations, that he was neither an officer nor stockholder in Global and that his sole benefit from the project was compensation for his services as an attorney. It is apparent that the Federal district court regarded the conduct of respondent's co-defendants as more culpable since both Joyce and Wallace received one-year imprisonment sentences in contrast to respondent's suspended sentence, fine and probation.

Conceding that Joyce and Wallace were the principal malefactors, however, does not absolve respondent. Wholly apart from the conclusiveness of his conviction and the opinion of the court of appeals, acceptance of respondent's assertions that he was totally unaware of any improprieties in connection with the real estate appraisals and financial statements would require us to ascribe to him an incredible naivete. While, fortunately, no financial loss appears to have been suffered by those who dealt with Global, the fraudulent scheme in which respondent was

convicted of participating carried with it the potential for substantial loss by those relying on the false information distributed by him and his co-defendants. In that sense his conduct can be considered more reprehensible than that of the lawyer whose misconduct affects only a single client or a more limited number of persons.

Our concern is with protection of the public, maintaining the integrity of the profession and preserving the administration of justice from reproach. Those objectives are properly served, in our judgment, by respondent's suspension from the practice of law for a period of three years from the date this opinion is filed. (*In re Grossgold* (1974), 58 Ill. 2d 9.) It is so ordered.

*Respondent suspended.*